Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/18/2019 01:10 AM CDT

STATE OF NEBRASKA, APPELLEE, V.
MALIK M. STELLY, APPELLANT.
___ N.W.2d ___

Filed September 13, 2019.    No. S-18-025.

1. **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.

2. **Trial: Photographs: Appeal and Error.** The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect. An appellate court reviews a trial court's admission of photographs of a victim's body for abuse of discretion.

3. **Effectiveness of Counsel: Constitutional Law: Statutes: Records: Appeal and Error.** Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.

4. **Search Warrants.** The purpose of the particularly requirement as it relates to warrants is to prevent general searches, and whether a warrant is insufficiently particular depends upon the facts and circumstances of each case.

5. **Search Warrants: Affidavits.** An inadvertent defect in a search warrant may be cured by reference to the affidavit used to obtain the warrant if the affidavit is incorporated in the warrant or referred to in the warrant and the affidavit accompanies the warrant.

6. **Homicide: Photographs.** If the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome.

7. ____: ____. In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.

8. **Homicide: Photographs: Juries: Proof.** Photographs can provide visual proof from which a jury could reasonably infer that the homicide was committed with deliberate and premeditated malice.

9. **Rules of Evidence: Photographs: Words and Phrases.** Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016), does not require the State to have a separate purpose for every photograph, and it requires a court to prohibit cumulative evidence only if it substantially outweighs the probative value of the evidence.

10. **Trial: Evidence: Appeal and Error.** The decision of the trial court as to whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice or the needless presentation of cumulative evidence will not be disturbed on appeal unless there has been an abuse of discretion.

11. **Effectiveness of Counsel: Proof: Words and Phrases.** Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.

12. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.

13. **Effectiveness of Counsel: Appeal and Error.** To raise a claim on direct appeal that trial counsel was ineffective, a defendant's brief must

specifically set forth how counsel's performance was deficient, but it need not also allege prejudice.

14. **Effectiveness of Counsel: Postconviction: Records: Appeal and Error.** An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.

15. **Effectiveness of Counsel: Records: Appeal and Error.** The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal. The determining factor is whether the record is sufficient to adequately review the question.

16. ____: ____: ____. The record on direct appeal is sufficient to review a claim of ineffective assistance if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.

17. ____: ____: ____. When reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance, and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.

18. **Criminal Law: Jurors: Proof.** Generally, a victim's qualities and personal attributes are irrelevant to the facts that the State must prove in a criminal prosecution and have the potential to distort the jurors' reasoned consideration of the evidence by evoking their sympathy for the victim and corresponding outrage toward the defendant.

19. **Effectiveness of Counsel: Prosecuting Attorneys: Presumptions: Appeal and Error.** An appellate court gives defense counsel's decision not to object to a prosecutor's conduct or remark a strong presumption of reasonableness.

20. **Effectiveness of Counsel: Claims.** A claim of ineffective assistance that is insufficiently stated is no different than a claim not stated at all.

21. **Postconviction: Effectiveness of Counsel: Claims: Appeal and Error.** When an appellate court finds, on direct appeal, that the record is not sufficient to resolve a claim of ineffective assistance, it should not be misunderstood as a finding that the claim will necessarily require an evidentiary hearing if raised in a motion for postconviction relief, because that determination is governed by an entirely different standard.

22. **Postconviction: Effectiveness of Counsel: Records: Claims: Appeal and Error.** Just because an appellate court finds the record on direct appeal is insufficient to resolve a claim of ineffective assistance, it does not mean that a postconviction court will necessarily be precluded from later finding the existing record affirmatively refutes the same claim.

Appeal from the District Court for Douglas County: Shelly R. Stratman, Judge. Affirmed.

Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Douglas J. Peterson, Attorney General, and Austin N. Relph for appellee.

Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Stacy, J.

In this direct appeal, Malik M. Stelly challenges his convictions for first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Finding no merit to his assignments of error, we affirm.

## I. BACKGROUND

On January 11, 2017, at 2:37 a.m., the "ShotSpotter" system in Omaha, Nebraska, indicated shots were fired in the area of 3615 Laurel Avenue. Officers responded to the alert and arrived on the scene within minutes to find D'Angelo Branch lying in a pool of blood on a residential sidewalk. Paramedics determined Branch had no pulse and declared him dead. An autopsy showed he died of multiple gunshot wounds to the head; in total, he sustained 16 wounds to the head and five additional wounds to his lower body.

### 1. Investigation

Several people who lived near the crime scene reported hearing multiple gunshots and seeing a silver Chrysler PT Cruiser driving away from the area. One person described

the PT Cruiser as having rust around the wheel wells on the driver's side in both the front and the back. Surveillance video from a nearby residence showed a silver PT Cruiser in the area during the relevant time.

Officers collected 11 spent casings from a 9-mm firearm from around Branch's body. They also recovered two cell phones from the crime scene: an LG cell phone that was found in the street about 10 to 15 feet from Branch's body and a ZTE cell phone that was found in Branch's pocket.

Later that day, officers obtained a search warrant and extracted data from the LG cell phone found in the street. That data indicated the cell phone belonged to Stelly. After learning Stelly's address, officers went to surveil his apartment complex. They found a silver PT Cruiser in the parking lot at the complex. The PT Cruiser was registered to Stelly's friend, Royce White.

While surveilling the apartment complex, officers saw Stelly and White leave in a green Cadillac. The Cadillac was registered to White's girlfriend. Officers followed the Cadillac and ultimately conducted a traffic stop. Stelly and White were transported to the police station and interviewed. After authorities obtained buccal swabs from each, Stelly and White were released.

A search warrant was then obtained for Stelly's apartment and the PT Cruiser. During the search of the apartment, officers discovered the keys to the PT Cruiser under some couch cushions. They also found and seized a hat they believed Stelly was wearing during the relevant time period based on time-stamped photographs discovered on Stelly's social media profile. The search of the PT Cruiser showed it had damage to the wheel wells on the driver's side. Evidence adduced at trial showed that White had loaned Stelly his silver PT Cruiser before the shooting because Stelly's car had been in an accident. Stelly's fingerprint was recovered from the interior doorframe of White's PT Cruiser.

The LG cell phone found in the street near Branch's body, and the hat seized from Stelly's apartment, were examined

by a forensic technician for blood and DNA testing. A few spots of blood were found on the underside of the hat brim, and the DNA was compared to known samples from Stelly, White, and Branch. Branch was not excluded as the major contributor to the DNA contained in the blood spots, and the probability of that DNA's coming from someone other than Branch was 1 in 47.4 nonillion. Stelly was not excluded as the major contributor to the DNA collected from the inside headband of the hat, and the probability of that DNA's having come from someone other than Stelly was 1 in 1.01 octillion. DNA found on the LG cell phone was tested, Stelly was not excluded as the major contributor, and the probability of that DNA's having come from someone other than Stelly was 1 in 4.12 sextillion.

Stelly was arrested and charged with first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person.

## 2. MOTION TO SUPPRESS

Before trial, Stelly moved to suppress certain evidence. As relevant to the issues raised on appeal, he sought to suppress evidence obtained from searching the contents of the LG cell phone found near Branch's body. The LG cell phone was searched pursuant to a warrant which Stelly challenged as insufficient. Specifically, Stelly claimed that the affidavit in support of the warrant, and the warrant itself, both identified the electronic device to be searched as the ZTE cell phone found in Branch's pocket rather than the LG cell phone that was actually searched.

At the suppression hearing, the warrant and attached affidavit were received into evidence. The affidavit recited in pertinent part:

> On Wednesday, January 11th, 2016 at 0237 hours [t]here was a ShotSpotter activation in the area of 3620 Laurel Avenue, Omaha, Douglas County, Nebraska. Shortly after that a shooting was called in at the same location.

When [o]fficers arrived on the scene they located a male party down . . . . This party was declared deceased by medic units at the scene. The victim appeared to have been shot multiple times, including at close range. Several spent 9mm casings were located near the victim.

. . . .

An LG model LG-LS755; MEID-D:089806163100 409889 cellular telephone was located in the street about 10 feet to the west of where the victim was located. Another cellular telephone was located in the victim's pocket[.]

It is unknown, at this time, who the LG cellular telephone belongs to, a suspect or a victim. Affiant [o]fficers believe that if [they] were allowed to examine the electronic data located on this telephone it would be a benefit to this investigation.

The affidavit also stated that the electronic device to be searched was in the lawful possession of the Omaha Police Department and was "found in the street at the scene of a homicide and seized as evidence." But elsewhere in the affidavit, the device to be searched was identified as the ZTE cell phone. Likewise, the warrant that was issued identified the ZTE cell phone as the device to be searched. The warrant was issued January 11, 2018, after which the LG cell phone found in the street was searched.

The officer who swore the affidavit testified at the suppression hearing. He noticed, after returning the warrant, that he had "made an error when listing the cell phone itself in the search warrant and the affidavit as far as property being searched." According to the officer, his narrative description correctly referenced the LG cell phone found in the street and explained why law enforcement wanted to search that cell phone, but when identifying the electronic device to be searched, he mistakenly "listed the cell phone that was recovered from the victim himself as opposed to the cell phone that was found in the street." After noticing the

error, the officer applied for and obtained another search warrant, this time referencing only the LG cell phone found in the street.

The district court determined that "[b]ased upon review of the search warrant and the [a]ffidavit attached thereto, it is clear that officers were seeking to search the LG phone that was found lying in the street approximately ten feet from the victim's body." Relying on *State v. Kleinberg*,[1] in which we held that "an inadvertent defect in a search warrant may be cured by reference to the affidavit used to obtain the warrant if the affidavit is incorporated in the warrant or referred to in the warrant and the affidavit accompanies the warrant," the court found the search of the LG cell phone constitutional and overruled the motion to suppress. Stelly renewed his motion to suppress at trial, and again it was overruled.

### 3. TRIAL

The case was tried to a jury over a period of 9 days in October 2017. We summarize only the evidence pertinent to the issues raised on appeal.

### (a) Murder Timeline

On January 10, 2017, the day before Branch was killed, Stelly and White celebrated Stelly's birthday. Stelly purchased some new clothes, including the hat later found in his apartment. At approximately 8 p.m., Stelly took several photographs with his cell phone and posted them on a social media website. One of these photographs showed Stelly wearing his recently purchased clothes.

Stelly's cell phone records indicate that from approximately 8:15 p.m. until just before 11 p.m. on January 10, 2017, his cell phone was "pinging off" a cell tower at 33d Street and Laurel Avenue, which was near White's house and the crime scene. Around midnight, Stelly's cell phone pinged off a cell tower

---

[1] *State v. Kleinberg*, 228 Neb. 128, 131, 421 N.W.2d 450, 453 (1988).

at 40th and Grant Streets. And finally, between 1:43 and 1:51 a.m. on January 11, Stelly had a text message conversation with the mother of his son in which he stated he was "bored" and "wanna act bad." The shooting occurred at 2:37 a.m. on January 11.

### (b) Exhibits

During trial, the State offered several photographs depicting Branch's body at the crime scene and during the autopsy. Stelly objected to four of the photographs taken at the crime scene on grounds they were "overly graphic" and "redundant." He objected to four of the autopsy photographs on grounds they were "overly gruesome." The court overruled Stelly's objections and admitted all eight photographs.

At another point during trial, the State identified a string of 12 exhibits, marked as exhibits 94 through 106. There was no exhibit 105 included in the string. After the witness was asked about each of the exhibits, the State offered them. But while reciting the string of exhibits, the State omitted reference to exhibit 103. This oversight was apparently not realized by either the parties or the court. When defense counsel was asked whether he had any objection to the offer, he replied: "No objection to 94 through 102. Our objection is to 103 and 104. No objection to 106." The court then ruled: "[E]xhibits 94 through 102 are received. The objections are noted on 103 and 104, those will be received. And 106 is received."

### (c) Evidence of Victim's
### Personal Attributes

During trial, testimony was adduced that Branch had a developmental disability and did not drive. Instead, he primarily walked or rode his bicycle for transportation. Several times during the trial, testimony was introduced by the State regarding Branch's personal attributes and his general good character. Defense counsel did not object to this testimony. Some of this evidence was referenced by the State during closing argument, again without objection.

#### (d) Verdicts and Sentences

The jury found Stelly guilty on all three counts. The trial court accepted the verdicts and convicted Stelly of first degree murder, use of a deadly weapon to commit a felony, and possession of a deadly weapon by a prohibited person. Stelly was sentenced to a term of life imprisonment on the murder conviction and to consecutive terms of 30 to 40 years' imprisonment on the other two convictions. Stelly filed this direct appeal, represented by new counsel.

## II. ASSIGNMENTS OF ERROR

Stelly assigns, reordered and restated, that the trial court erred in (1) denying his motion to suppress the search of his cell phone and (2) admitting graphic and duplicative photographs over trial counsel's objections. He also asserts 18 different claims of ineffective assistance of trial counsel, and he argues that the cumulative effect of these alleged deficiencies deprived him of a fair trial.

## III. STANDARD OF REVIEW

[1] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review.[2] Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.[3]

[2] The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect.[4] An appellate court reviews a trial

---

[2] *State v. Botts*, 299 Neb. 806, 910 N.W.2d 779 (2018).

[3] *Id.*

[4] *State v. Dubray*, 289 Neb. 208, 854 N.W.2d 584 (2014).

court's admission of photographs of a victim's body for abuse of discretion.[5]

[3] Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement.[6] An appellate court determines as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance.[7]

## IV. ANALYSIS

### 1. Motion to Suppress

Stelly argues that evidence from the search of the LG cell phone found near Branch's body should have been suppressed. He points to the fact that the first search warrant, and portions of the supporting affidavit, identified a different cell phone as the electronic device to be searched. He thus appears to be arguing that the first warrant was not particular enough in its description of the item to be searched.

[4] The purpose of the particularly requirement as it relates to warrants is to prevent general searches, and whether a warrant is insufficiently particular depends upon the facts and circumstances of each case.[8] As a general rule, the description must enable officers to ascertain and identify the items to be seized with reasonable certainty and little chance of confusion or uncertainty.[9]

---

[5] *Id.*

[6] *State v. Golyar*, 301 Neb. 488, 919 N.W.2d 133 (2018).

[7] *Id.*

[8] See, *State v. Johnson*, 243 Neb. 758, 502 N.W.2d 477 (1993); *State v. Walters*, 230 Neb. 539, 432 N.W.2d 528 (1988).

[9] See 79 C.J.S. *Searches* § 243 (2017). See, also, *State v. Groves*, 239 Neb. 660, 477 N.W.2d 789 (1991).

Stelly's argument in support of this assignment of error is limited. He contends only that the district court erred in applying the rationale of *Kleinberg*[10] to conclude the affidavit cured any deficiency in the warrant. We limit our analysis accordingly.

[5] *Kleinberg* held that "an inadvertent defect in a search warrant may be cured by reference to the affidavit used to obtain the warrant if the affidavit is incorporated in the warrant or referred to in the warrant and the affidavit accompanies the warrant."[11] In *Kleinberg*, police officers had been informed the defendant had marijuana in his vehicle and they applied for a warrant to search the vehicle. The supporting affidavit sought to search the vehicle, but the warrant authorized a search of the defendant's person. The police served the warrant on the defendant and then searched his vehicle, but did not search his person. Marijuana was found in the vehicle, and the defendant was arrested. The defendant moved to suppress the evidence, arguing the warrant did not authorize a search of his vehicle. The trial court overruled the motion to suppress, and we affirmed. In doing so, we reasoned that the warrant referred to and was accompanied by the affidavit discussing the search of the vehicle and that the information in the affidavit could "be used to cure the defect in the warrant resulting from the error of the scrivener."[12]

Here, as in *Kleinberg*, the warrant referred to and was accompanied by an affidavit. And although both the warrant and the affidavit misidentified the ZTE cell phone as the item to be searched, a review of the information in the supporting affidavit demonstrates the reference to the ZTE cell phone was an inadvertent scrivener's error, as it is clear the officers were seeking a warrant to search the LG cell phone found lying in the street near Branch's body. The affidavit reads, "The

[10] *Kleinberg, supra* note 1.

[11] *Id.* at 131, 421 N.W.2d at 453.

[12] *Id.* at 134, 421 N.W.2d at 454.

telephone was found in the street at the scene of a homicide and seized as evidence." Additionally, it states:

> An LG model . . . cellular telephone was located in the street about 10 feet to the west of where the victim was located. Another cellular telephone was located in the victim's pocket[.]
>
> It is unknown, at this time, who the LG cellular telephone belongs to, a suspect or a victim. Affiant [o]fficers believe that if [they] were allowed to examine the electronic data located on this telephone it would be a benefit to this investigation.

We conclude that the detailed information in the supporting affidavit cured any defect in the warrant resulting from the scrivener's error in misidentifying the ZTE cell phone as the item to be searched. Moreover, reading the information in the affidavit and the warrant together, the item to be searched was described with sufficient particularity to allow the executing officer to ascertain and identify the item to be searched with reasonable certainty. Stelly's argument to the contrary is without merit, and the district court did not err in overruling the motion to suppress.

## 2. Photographs of Victim

Stelly argues the trial court improperly admitted eight photographic exhibits over his objections that some were overly graphic and redundant and that others were overly gruesome. Although Stelly did not expressly object to any of the photographs on Neb. Evid. R. 403[13] grounds, his objections were treated as seeking exclusion on grounds the photographs, even if relevant, were gruesome and cumulative and thus were more prejudicial than probative. He makes the same argument on appeal.

In response to Stelly's objections, the district court examined the photographs outside the presence of the jury and asked the State to explain the relevance of each. The court also

---

[13] Neb. Rev. Stat. § 27-403 (Reissue 2016).

explored with counsel whether any of the photographs were duplicative and whether other photographs existed showing the same areas of Branch's body after he had been "cleaned up." Summarized, the State explained that more than 200 photographs had been taken and that although some of the 8 being offered were similar, they were taken from different angles and distances to depict different areas of Branch's body at different points during the investigation and to highlight different things of evidentiary significance. The court overruled Stelly's objections and admitted all eight photographs.

"The admission of photographs of a gruesome nature rests largely with the discretion of the trial court, which must determine their relevancy and weigh their probative value against their prejudicial effect."[14] On appeal, the State does not dispute that the photographs depicting Branch's body after the shooting were gruesome, but it points out that this does not render them inadmissible.

[6,7] We have often observed that gruesome crimes produce gruesome photographs,[15] but if the State lays proper foundation, photographs that illustrate or make clear a controverted issue in a homicide case are admissible, even if gruesome.[16] In a homicide prosecution, a court may admit into evidence photographs of a victim for identification, to show the condition of the body or the nature and extent of wounds and injuries to it, and to establish malice or intent.[17]

The photographs taken at the scene of the crime show Branch's body as it was discovered, lying on the sidewalk in a pool of blood. The photographs depict the nature, extent, and location of the multiple bullet wounds, and illustrate the spatial relationship of Branch's body to the spent shell casings discovered near and under his body. The photographs taken

---

[14] *Dubray, supra* note 4, 289 Neb. at 218, 854 N.W.2d at 599.

[15] *Dubray, supra* note 4.

[16] *Id.*

[17] *Id.*

during the autopsy show portions of Branch's body not otherwise visible in the photographs taken at the scene, including a photograph of a projectile in his left eye.

[8] We have recognized that photographs can also provide "'visual proof from which a jury could reasonably infer that the homicide was committed with "deliberate and premeditated malice."'"[18] Here, in addition to showing the condition of the body and the nature and extent of the wounds, the photographs tended to establish malice or intent in that they showed multiple shots were fired at Branch's head. We conclude that although the photographs were gruesome, their probative value was not substantially outweighed by the danger of unfair prejudice.

Stelly also objected that some of the four photographs from the crime scene were unnecessarily cumulative, in that they showed some of the same bullet wounds. We pause to note that his brief on appeal argues that some of the autopsy photographs should also have been excluded as cumulative, but because he did not object to the autopsy photographs on that basis at trial, he has not preserved the issue for appellate review.[19] We thus address only Stelly's argument that the four photographs of the crime scene were needlessly cumulative.

In that regard, he argues that some of the same bullet wounds are visible in more than one crime scene photograph. While he is correct, that is due in large part to the sheer number of wounds to Branch's head and body. Moreover, Stelly's argument ignores the different evidentiary significance of the four photographs. Three of the photographs depict entirely different areas of Branch's body and clothing, and although there are two photographs depicting the injuries to the right side of Branch's head, one of the photographs was taken from an angle that shows the proximity of several shell casings not visible in the other photograph.

---

[18] *State v. Ryan*, 226 Neb. 59, 87, 409 N.W.2d 579, 596 (1987).

[19] *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003) (objections not presented to and passed upon by trial court will not be considered on appeal).

[9,10] Rule 403 does not require the State to have a separate purpose for every photograph, and it requires a court to prohibit cumulative evidence only if it "'substantially'" outweighs the probative value of the evidence.[20] The decision of the trial court as to whether the probative value of evidence is substantially outweighed by the danger of unfair prejudice or the needless presentation of cumulative evidence will not be disturbed on appeal unless there has been an abuse of discretion.[21]

Here, we find the court admitted the photographs for a proper purpose and did not abuse its discretion in concluding that multiple photographs of the same wounds were not unfairly prejudicial.

### 3. Ineffective Assistance of Counsel

[11] Stelly asserts a total of 18 different claims of ineffective assistance of trial counsel. Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*,[22] the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense.[23] To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law.[24] To show prejudice, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different.[25]

---

[20] *Dubray, supra* note 4, 289 Neb. at 219, 854 N.W.2d at 600.

[21] See *State v. Baltimore*, 236 Neb. 736, 463 N.W.2d 808 (1990), *disapproved on other grounds, State v. Messersmith*, 238 Neb. 924, 473 N.W.2d 83 (1991).

[22] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

[23] *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019).

[24] *Id.*

[25] *Id.*

Summarized, Stelly's brief asserts his trial counsel was ineffective in (1) failing to object when the trial court received exhibit 103, which had never been offered; (2) failing to object to evidence of and argument concerning Branch's personal attributes and good qualities; and (3) failing to adequately investigate or present evidence in 16 different instances. We address each claim in turn, but first we set out the law that governs our analysis of ineffective assistance claims on direct appeal.

[12,13] It is well settled that when a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding.[26] In *State v. Filholm*,[27] we explained that to raise a claim on direct appeal that trial counsel was ineffective, a defendant's brief must specifically set forth how counsel's performance was deficient. But we clarified that the brief need not also allege prejudice:

> Although our case law makes clear that specific allegations of prejudice are required within the context of postconviction relief, we view such a requirement on direct appeal as a waste of time and resources. As we have noted, the trial record on appeal is devoted to issues of guilt or innocence, not counsel's performance. Thus, to require an appellant to allege prejudice from ineffective assistance on direct appeal would require him or her to allege facts in detail that are likely not within the appellate record or known to the defendant without further inquiry. . . . We therefore see no justification for requiring an appellant to allege prejudice when claiming ineffective assistance of trial counsel on direct appeal. That said, we emphasize that in the context of direct appeal, like the requirement in postconviction

---

[26] *Id.*

[27] *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

proceedings, mere conclusions of fact or law are not sufficient.[28]

[14] An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to be able to recognize whether the claim was brought before the appellate court.[29]

[15-17] The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved on direct appeal.[30] The determining factor is whether the record is sufficient to adequately review the question.[31] We have said the record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice, or that trial counsel's actions could not be justified as a part of any plausible trial strategy.[32] We have also said that when reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance, and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[33]

With this framework in mind, we consider Stelly's various claims that his trial counsel performed deficiently.

### (a) Exhibit 103

During trial, exhibit 103 was received into evidence over Stelly's objection, despite the fact that the State failed to

---

[28] *Id*. at 770-71, 848 N.W.2d at 578-79.

[29] *State v. Manjikian*, 303 Neb. 100, 927 N.W.2d 48 (2019).

[30] *Id.*; *Munoz, supra* note 23.

[31] *Id.*

[32] *Munoz, supra* note 23.

[33] See *State v. Hibler*, 302 Neb. 325, 923 N.W.2d 398 (2019).

formally offer exhibit 103 into evidence. The exchange at trial occurred as follows:

> [The State]: Judge, we're going to offer Exhibits 94 through 100 and then 101, 102, 104 and 106.
>
> [Defense counsel]: No objection to 94 through 102. Our objection is to 103 and 104. No objection to 106.
>
> THE COURT: 94 through 102 are received. The objections are noted on 103 and 104, those will be received. And 106 is received.

Stelly argues that although his trial counsel objected to exhibit 103, his trial counsel performed deficiently by failing to also object to the court's receipt of exhibit 103 on the ground that the State had never offered it. Both Stelly and the State agree that the record is sufficient on appeal to address this claim, and we agree. We therefore turn to the merits.

The State argues that trial counsel was not deficient in failing to object to the court's receipt of exhibit 103 because trial counsel was aware, based on prior discussions outside the presence of the jury, that the State's failure to formally offer exhibit 103 was inadvertent and easily cured. This is supported by the record.

Prior to the formal offer of the string of exhibits identified in the above exchange, counsel for both parties informed the court, outside the presence of the jury, that defense counsel intended to object to exhibits 103 and 104 as cumulative and unfairly prejudicial. After some discussion, the court informed counsel at sidebar that it would "allow 103 and 104 since they are different."

The formal offer of exhibits occurred after this sidebar. The record shows that defense counsel was aware the State intended to offer exhibit 103 and was further aware the court intended to receive the exhibit over trial counsel's objection. Under such circumstances, if trial counsel had objected to the court's receipt of exhibit 103 despite the State's failure to offer it, the State would have easily corrected the oversight. In other words, with or without the objection that Stelly claims his counsel should have made, the exhibit would have been

received. Stelly can show no prejudice, and his first claim of ineffective assistance of trial counsel has no merit.

### (b) Evidence of Personal
### Attributes of Victim

Stelly claims his trial counsel performed deficiently by failing to object to testimony and argument regarding Branch's general good character and his diminished mental capacity. Both Stelly and the State contend the record is sufficient on appeal to resolve this claim of ineffective assistance of counsel. We agree.

At trial, two of the State's witnesses—Branch's brother and Branch's girlfriend—testified about Branch's personal attributes. The following testimony was adduced without objection from Branch's brother:

> [Branch] was very helpful to just about everybody he came in contact with. You know, friends, family. I mean, you couldn't really ask for a better person than [Branch] because — he was mentally challenged. He had — he was born with water on his brain, but he was still just a lovable person, you know. We looked at him as one of God's angels because he wasn't supposed to make it a year after his birth. He was supposed to die. He made it all the way to 29.

Branch's brother also testified that Branch "had the mind of a kid instead of an adult. So he was 29, he was probably 14 in — in his head he was 14. He was still a kid." He explained that Branch attended special education classes while in school.

Branch's girlfriend also testified to Branch's personal attributes without objection. She stated that Branch "got along very well with everybody. He was very helpful, very kind, especially very kind to me." She described him as very loving and caring, but with an IQ that was lower than that of the average person.

During closing arguments, the prosecutor summarized the testimony of Branch's brother and girlfriend, without objection from trial counsel:

You also heard from . . . Branch's brother . . . .

He described [Branch] as, quote, one of God's angels. He related to you that [Branch] shouldn't have made it past one year of age because he was born with water on the brain. As a result of that condition, he forever — or at the point of his death, had the mentality of a 14-year-old. He told you that [Branch] went to North High School and graduated, but he required special education during his time there.

He described [Branch] as helping everyone and would not drive, but he said he would walk around town, walking as he was on the early morning hours of January 11th, 2017, when he was trying to walk home from [Branch's girlfriend's] house to his family's house. He didn't have a car. He relied on walking.

. . . .

. . . [Branch's girlfriend] told you that [Branch] was very kind. He wasn't of the highest IQ, in her opinion, but they were able to communicate. He treated her well, and she was dating him. . . .

. . . .

. . . It's time to hold [Stelly] accountable. He murdered . . . Branch, who is a stable man simply trying to get home at the end of the night. He was gunned down in the street. His body was left there, and [Stelly] fled because [Stelly] is the one who perpetrated it. He needs to be held accountable.

[18] Generally, a victim's qualities and personal attributes are irrelevant to the facts that the State must prove in a criminal prosecution and have the potential to distort the jurors' reasoned consideration of the evidence by evoking their sympathy for the victim and corresponding outrage toward the defendant.[34] But here, it cannot be said that all the evidence of Branch's personal attributes was irrelevant. Evidence that he did not drive due to his diminished mental capacity tends

---

[34] *Dubray, supra* note 4.

to explain why he was out walking at the time he was shot, and it was relevant for that purpose. But the related testimony and argument that Branch was kindhearted and had overcome obstacles in his life were relevant neither to the facts the State had to prove nor to any defense raised by Stelly.

[19] That said, an appellate court gives defense counsel's decision not to object to a prosecutor's conduct or remark a strong presumption of reasonableness.[35] Counsel may have made a sound tactical decision in not objecting, and "'[i]t is not beyond comprehension to envision an instance where a surely winnable objection may still hurt the defense in the eyes of the jury.'"[36]

In this case, defense counsel agreed during his closing argument that this was "a horrible crime" and remarked: "It's senseless. His poor family." These remarks suggest counsel may have made a tactical decision not to object to evidence of Branch's personal attributes because, even if the objections were winnable, he decided it was better for the jury to see Stelly as sympathetic to the loss of an innocent life, while denying that he was the perpetrator.

Even if counsel's failure to object was not a tactical decision, we find this record is sufficient to conclude that Stelly was not prejudiced by counsel's alleged deficient performance.[37] Our analysis in *State v. Iromuanya*[38] and *State v. Dubray*[39] is instructive.

In *Iromuanya*, we considered whether defense counsel was ineffective for failing to object to the prosecutor's improper statements and questions. During opening statements, the prosecutor remarked about one victim's accomplishments in collegiate soccer and the other victim's academic achievements.

---

[35] See *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

[36] *Id.* at 813, 806 N.W.2d at 423, quoting *Ayers v. State*, 802 A.2d 278 (Del. 2002).

[37] See *Hibler, supra* note 33.

[38] *Iromuanya, supra* note 35.

[39] *Dubray, supra* note 4.

The prosecutor also asked the surviving victim to recall for the jury how he learned of the other victim's death. We disapproved of the prosecutor's improper statements and question, but we found the defendant was not prejudiced by the deficient conduct. We reasoned the trial court had orally instructed jurors before trial that attorney statements and arguments were not evidence. And we noted that the statements represented short moments in a long trial during which many other witnesses testified about the critical issue in the case—whether the defendant had shot at the victims with the intent to kill. Further, we emphasized that the trial court's written instructions informed the jurors that they must not decide the case based on sympathy or prejudice. We therefore concluded that the prosecutor's improper statements and question did not result in prejudicial error.

In *Dubray*, we considered whether defense counsel was deficient for failing to object to improper remarks the prosecutor made, during closing arguments, about the victim's personal qualities and attributes:

"Now, I don't — never knew [the victims]. These are two beautiful human beings. They had love in their heart, they had goals, they had aspirations, they had children, they had all of those things in life that people could want. Nothing was perfect but is it ever for any of us? And to have their lives taken from them so savagely, so brutally at 22 years old. And [one victim is] never going to his boy's ball games. And [the other victim will] never see her kids again. 'Take care of my baby.' That's what you are supposed to be doing. That's what she's supposed to be doing. They were killed for no reason. He took their lives and the evidence shows that he did so brutally with premeditation.

"Find him guilty of two counts of first degree murder and use of a weapon. The law requires it. And justice demands it. Thank you."[40]

---

[40] *Id.* at 220, 854 N.W.2d at 600.

We found this argument was improper, but concluded the defendant could not show prejudice from his counsel's failure to object. We found it significant that the trial court had admonished the jury not to let sympathy or passion influence its verdict and also had instructed that the attorneys' statements were not evidence. Moreover, we noted that the evidence against the defendant was "strong" and that, viewing the trial as a whole, we could not find the defendant had been deprived of a fair trial because of the prosecutor's remarks.[41]

We reach a similar conclusion here. Even assuming trial counsel performed deficiently by failing to object to at least some of the testimony and argument about Branch's personal traits, Stelly cannot show he was deprived of a fair trial or demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. Here, as in *Iromuanya*[42] and *Dubray*, the testimony and argument regarding the personal attributes of the victim were a small part of an otherwise lengthy trial in which there was strong evidence of the defendant's guilt. Moreover, the trial court admonished the jury not to let sympathy or prejudice influence its decision and also instructed the jury that statements, arguments, and questions of the lawyers for the State and the defendant were not evidence.

We conclude the record affirmatively shows that Stelly cannot demonstrate he was prejudiced by any deficient performance of his trial counsel in failing to object to testimony and argument regarding the personal attributes of Branch. This claim of ineffective assistance of trial counsel is without merit.

### (c) Failure to Investigate

Stelly asserts his trial counsel was ineffective in failing to independently investigate certain defenses and failing to interview or question certain witnesses. He argues generally

---

[41] *Id.* at 228, 854 N.W.2d at 605.

[42] *Iromuanya, supra* note 35.

that had trial counsel done so, he would have discovered or adduced evidence helpful to Stelly's defense. Stelly's brief sets out 16 such claims, which we summarize and number for ease of reference:

(1) Trial counsel failed to consult with or call as a witness an expert on the ShotSpotter system. Such an expert would have testified that the ShotSpotter equipment recorded two separate shootings in two different locations at approximately 2:37 a.m. on January 11, 2017, rather than one shooting in the area of 3615 Laurel Avenue.

(2) Trial counsel failed to investigate or subpoena Carrie Crook as a witness. Crook would have testified that, contrary to the State's prosecution theory, Stelly did not borrow a PT Cruiser from White during the month of January 2017, but continued to drive his 1985 Chevy Caprice. Crook would have further testified that White loaned the PT Cruiser to many people.

(3) Trial counsel failed to investigate video from a clothing store that would have shown Stelly was not driving a PT Cruiser on January 10, 2017.

(4) Trial counsel failed to consult with or call as a witness an independent expert in the field of ballistics upon learning that the State's ballistics expert could not conclusively determine whether the bullets recovered were fired from the same firearm. An independent ballistics expert would have testified that the bullets were fired from more than one firearm and would support a conclusion that some bullets were planted at the scene.

(5) Trial counsel failed to investigate the source of calls to White's cell phone from two specific telephone numbers which would have revealed that officers called White's cell phone themselves after illegally searching the LG cell phone found near Branch's body without a warrant.

(6) Trial counsel failed to obtain Stelly's clothing "as seen in [a convenience store] video," which clothing was "available" to trial counsel and would have disproved the State's theory

that Stelly either hid or destroyed the clothing he was wearing at the time of the shooting.[43]

(7) Trial counsel failed to obtain the recording of a call to the 911 emergency dispatch service to report the shooting. Stelly claims the recording would have demonstrated that one or more officers testified falsely as to the time they arrived at the crime scene.

(8) Trial counsel failed to investigate the circumstances of a second crime scene that was being processed on January 11, 2017, as testified to by a technician who testified that she was "working that day and responding to another crime scene, but was asked to drop off some scanning equipment to a homicide investigation" in the area of 3615 Laurel Avenue. Further investigation would have revealed that shell casings or bullet fragments allegedly found at the scene of Branch's shooting came from the other crime scene being processed by the technician.

(9) Trial counsel failed to investigate or ask whether the State's witnesses who lived in the area of the shooting, but not directly on Laurel Avenue, believed they heard shots from two different shootings.

(10) Trial counsel failed to consult with and call as a witness an independent DNA expert who, upon comparing the DNA swabs taken from inside the PT Cruiser (which were not submitted for testing) with known samples taken from Stelly, would have testified that Stelly's DNA was not found on any surfaces or objects inside the PT Cruiser.

(11) Trial counsel failed to consult with and call as a witness an independent fingerprint expert who, upon analyzing the latent fingerprint evidence allegedly obtained by the officers and technicians who testified for the State, would have testified that Stelly's fingerprints were not present on the surfaces claimed by the technicians.

(12) Trial counsel failed to consult with and call as a witness an independent cell phone expert who, upon analyzing

---

[43] Brief for appellant at 29.

the LG cell phone found near Branch's body, would have testified that the data officers purportedly extracted from the LG cell phone was not in fact present on it and that one or more officers manufactured cell phone evidence. Such expert would also have testified that officers sent and received text messages and voice calls using the LG cell phone, but testified falsely and failed to disclose this fact to trial counsel, the trial court, and the jury.

(13) Trial counsel failed to elicit testimony or obtain and introduce 911 records that would have demonstrated that the times of the 911 calls made by two individuals disprove the officers' testimonies as to the timeline of the shootings on January 11, 2017. Such testimony would have demonstrated that the officers changed Branch's time of death from the actual time, approximately 11 p.m. on January 10, to the time testified to at trial, approximately 2:37 a.m. on January 11.

(14) Trial counsel failed to elicit testimony or obtain and introduce Omaha Fire Department records that would have demonstrated that the arrival times of the fire department paramedics disprove the officers' testimony as to the timeline of the shootings on January 11, 2017.

(15) Trial counsel failed to elicit testimony from all the resident witnesses as to their best estimates of the time of night they heard shots and saw the PT Cruiser. Said testimony would have disproved the officers' testimony as to the timeline of the shootings on January 11, 2017. Such testimony would have demonstrated that officers changed Branch's time of death from the actual time, approximately 11 p.m. on January 10, to the time testified to at trial, approximately 2:37 a.m. on January 11.

(16) Trial counsel failed to ask questions of the State's witnesses that would have revealed a break in the chain of custody of the shell casings and bullet fragment evidence allegedly recovered at the scene of the shooting and supported a defense theory that officers planted evidence from the other crime scene being processed on January 11, 2017, by a technician.

Stelly suggests the record is insufficient to resolve any of these 16 claims on direct appeal. The State agrees and addresses all 16 claims collectively in a single sentence, suggesting they are "better left for postconviction review."[44] But on direct appeal, our appellate review of ineffective assistance claims requires more than just noting the claims and postponing consideration for another day.

An appellate court is required to consider whether the defendant has adequately alleged a claim of ineffective assistance,[45] and if so, must then consider whether the record on appeal is sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance.[46] In the future, we encourage all parties to address these considerations in their appellate briefing.

We have considered Stelly's claims in light of the record on appeal. As we explain below, we conclude that some of his claims were insufficiently pled. Of those claims that were sufficiently pled, we conclude some are affirmatively refuted by the record and others cannot be resolved on direct appeal.

### (i) Record Affirmatively Refutes Claims 5, 6, 9, and 15

#### a. White's Cell Phone, Claim 5

Stelly claims that if an investigation had been undertaken, counsel would have discovered that police officers called White's cell phone after "illegally" searching Stelly's LG cell phone "without a warrant."[47] As noted earlier in our analysis of Stelly's motion to suppress, the search of his LG cell phone was pursuant to a valid warrant. Because there was no illegal search of Stelly's LG cell phone, the entire premise

---

[44] Brief for appellee at 19.

[45] See, *Manjikian, supra* note 29; *Filholm, supra* note 27.

[46] See *Hibler, supra* note 33.

[47] Brief for appellant at 29.

of this claim fails. There is no merit to this claim of ineffective assistance.

### b. Clothing From Video, Claim 6

Stelly claims the clothes he was wearing could be "seen"[48] in a convenience store video taken the night of the murder, and he alleges trial counsel was deficient in not obtaining that clothing to rebut the State's theory at trial that Stelly either hid or destroyed the clothing he was wearing the night of the murder.

The convenience store video is a part of the record, and we have reviewed it. In the video, the PT Cruiser can be seen as it proceeds down the roadway, but neither the occupants inside, nor their clothing, are plainly visible. Because the video does not show the clothing Stelly was wearing, the record affirmatively refutes this allegation of deficient performance.

### c. Questions About Two Shootings, Claim 9

At trial, the State called several witnesses who lived in the area of the shooting, but not on Laurel Avenue. Each testified to hearing multiple gunshots in the early hours of January 11, 2017. They testified that they heard between four and eight shots fired, and each described the gunshots as rapidly occurring, one right after the other.

Stelly alleges his trial counsel was deficient because he failed to inquire whether these lay witnesses believed the shots were from "two different shootings."[49] But he does not suggest any of these witnesses had special training or knowledge in ballistics or were otherwise capable of differentiating the source of bullets based on their sound. As such, any question seeking to elicit an opinion from these witnesses on whether the shots were coming from more than one shooting would have been objectionable. Because counsel cannot be

---

[48] *Id*.

[49] *Id*. at 30.

deficient for failing to ask a plainly objectionable question, this claim is without merit.

### d. Testimony of Timeline From Neighborhood Witnesses, Claim 15

Stelly claims his trial counsel failed to elicit testimony from witnesses regarding their "best estimates of the time"[50] when they heard shots and saw the PT Cruiser. He claims that if counsel had done so, he would have obtained information that the shooting occurred at 11 p.m. on January 10, 2017, contradicting the State's evidence that the shooting occurred at 2:37 a.m. on January 11.

We conclude the record affirmatively refutes this claim of deficient performance. Each witness testified to having heard gunshots and seen the PT Cruiser in the early hours of January 11, 2017. In light of this testimony, Stelly cannot show prejudice from his trial counsel's failure to question the witnesses about their best estimates of when the shooting occurred. This claim of ineffective assistance is meritless.

### (ii) Part of Claim 14 and All of Claim 16 Lack Particularity

### a. Omaha Fire Department Records, Claim 14

Stelly's claim 14 is twofold. He claims that his trial counsel failed to elicit testimony about Omaha Fire Department records that would have contradicted the State's evidence as to the timeline of the shooting on January 11, 2017, and he claims that his trial counsel failed to actually obtain and introduce the Omaha Fire Department records. As to the first part of his claim, Stelly does not allege what testimony his counsel should have sought to elicit or from whom, and thus, he has failed to allege deficient performance with sufficient particularity. As we note later in our analysis, the second part of claim 14

---

[50] *Id.* at 31.

is alleged with sufficient particularity, but the record does not permit us to resolve it on direct appeal.

### b. Chain of Custody, Claim 16

Stelly claims his trial counsel failed to ask questions of the State's witnesses that would have revealed a break in the chain of custody of the shell casing and bullet fragment evidence recovered from the scene of the shooting. He suggests such a break would have supported a defense that officers planted evidence from another crime scene being processed on January 11, 2017.

[20] But Stelly does not allege which of the State's many witnesses should have been questioned about the possible break in the chain of custody or how their testimony would reveal such a break. We conclude Stelly has failed to allege this claim of deficient performance with sufficient particularity. A claim of ineffective assistance that is insufficiently stated is no different than a claim not stated at all.[51]

### (iii) Record Insufficient to Resolve Claims 1 Through 4, 7, 8, and 10 Through 13 and Part of Claim 14

We conclude Stelly's remaining claims of ineffective assistance cannot be resolved on direct appeal, because the record is not sufficient to conclusively determine whether counsel did or did not perform in a deficient manner or whether Stelly was or was not prejudiced by counsel's alleged deficient performance.[52] We emphasize two important points about our conclusion that the record is insufficient to resolve these claims.

[21] First, when an appellate court finds, on direct appeal, that the record is not sufficient to resolve a claim of ineffective assistance, it should not be misunderstood as a finding that the claim will necessarily require an evidentiary hearing if raised

---

[51] See *State v. Hood*, 301 Neb. 207, 917 N.W.2d 880 (2018).

[52] See *State v. Cullen*, 292 Neb. 30, 870 N.W.2d 784 (2015).

in a motion for postconviction relief,[53] because that determination is governed by an entirely different standard.[54]

[22] And second, just because an appellate court finds the record on direct appeal is insufficient to resolve a claim of ineffective assistance, it does not mean that a postconviction court will necessarily be precluded from later finding the existing record affirmatively refutes the same claim. Several factors make this so. Sometimes, critical portions of the existing trial record are not included in the appellate record, but are later available to the postconviction court. Additionally, because a defendant on direct appeal is not required to make specific allegations of prejudice,[55] the appellate court often has an incomplete understanding of how a defendant claims to have been prejudiced by certain deficient conduct. Consequently, a finding on direct appeal that the existing record is insufficient to determine a claim of deficient conduct does not speak to whether the existing record will be sufficient to affirmatively refute prejudice once the claim is alleged on postconviction.

## 4. Cumulative Error

Finally, Stelly argues that the cumulative effect of the trial court's errors, and his trial counsel's deficiencies, deprived him of a fair trial. We have recognized the doctrine of cumulative error in the context of a criminal jury trial,[56] but it is not supported in this case.

We found no merit to any of Stelly's assigned errors. And we concluded that 8 of his 18 claims of ineffective assistance are either without merit or not alleged with sufficient

---

[53] *Filholm, supra* note 27.

[54] See, e.g., *State v. Tyler*, 300 Neb. 365, 918 N.W.2d 306 (2018) (to be entitled to evidentiary hearing, prisoner must allege facts in motion for postconviction relief that, if proved, would constitute violation of his or her rights under U.S. or Nebraska Constitution).

[55] *Filholm, supra* note 27.

[56] See *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016).

particularity. We are unable, on direct appeal, to resolve Stelly's remaining claims of ineffective assistance of trial counsel, and thus, those unresolved claims cannot form the basis for a claim of cumulative error. Stelly's cumulative error argument is without merit.

## V. CONCLUSION

For the foregoing reasons, we affirm Stelly's convictions and sentences.

Affirmed.

Heavican, C.J., not participating.