Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/25/2020 08:08 AM CDT

State of Nebraska, appellee, v.
Ahmed Said, appellant.
___ N.W.2d ___

Filed July 2, 2020.    No. S-18-901.

1.  **Motions to Suppress: Confessions: Constitutional Law: Miranda Rights: Appeal and Error.** In reviewing a motion to suppress a statement based on its claimed involuntariness, including claims that law enforcement procured it by violating the safeguards established by the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination.
2.  **Constitutional Law: Search and Seizure: Motions to Suppress: Appeal and Error.** In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination.
3.  **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.
4.  **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

5. **Trial: Rules of Evidence.** A trial court exercises its discretion in determining whether evidence is relevant and whether its prejudicial effect substantially outweighs its probative value.

6. **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

7. **Trial: Evidence: Appeal and Error.** A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of an abuse of discretion.

8. **Miranda Rights: Self-Incrimination.** The safeguards of *Miranda* ensure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process.

9. **____: ____.** If the suspect indicates that he or she wishes to remain silent or that he or she wants an attorney, the interrogation must cease.

10. **Miranda Rights: Right to Counsel: Police Officers and Sheriffs: Self-Incrimination.** In order to require cessation of custodial interrogation, the subject's invocation of the right to counsel must be unambiguous and unequivocal. Once a person has invoked his or her right to remain silent, the police must scrupulously honor that right.

11. **Constitutional Law: Trial: Convictions: Appeal and Error.** Even constitutional error does not automatically require reversal of a conviction if that error was a trial error and not a structural defect.

12. **Trial: Evidence: Appeal and Error.** The admission of an improperly obtained statement is a trial error, and so its erroneous admission is subject to harmless error analysis.

13. **Trial: Verdicts: Appeal and Error.** Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error.

14. **Search and Seizure: Police Officers and Sheriffs: Evidence.** Evidence must be excluded as fruit of the poisonous tree if it is discovered by the exploitation of illegal police conduct.

15. **Evidence: Police Officers and Sheriffs.** Not all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal action of the police. The question is whether the evidence has been obtained by exploiting the primary illegality or has instead been obtained by means sufficiently distinguishable so as to be purged of the primary taint.

16. **Search Warrants: Affidavits: Probable Cause: Appeal and Error.** In reviewing the strength of an affidavit submitted as a basis for finding

probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test. The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause.

17. **Search Warrants: Probable Cause: Words and Phrases.** Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found.

18. **Search Warrants: Affidavits: Evidence: Appeal and Error.** In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued.

19. **Constitutional Law: Search Warrants.** The Fourth Amendment to the U.S. Constitution and Neb. Const. art. I, § 7, require that a search warrant be particular in describing the place to be searched and the persons or things to be seized.

20. **Constitutional Law: Search Warrants: Police Officers and Sheriffs.** To satisfy the particularity requirement of the Fourth Amendment, a warrant must be sufficiently definite to enable the searching officer to identify the property authorized to be seized.

21. **Search Warrants.** The purpose of the particularity requirement as it relates to warrants is to prevent general searches, and whether a warrant is insufficiently particular depends upon the facts and circumstances of each case.

22. **Search Warrants: Affidavits.** An inadvertent defect in a search warrant may be cured by reference to the affidavit used to obtain the warrant if the affidavit is incorporated in the warrant or referred to in the warrant and the affidavit accompanies the warrant.

23. **Criminal Law: Constitutional Law: Due Process.** Whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clauses of the 6th Amendment, the federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense.

24. **Evidence.** Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Relevancy requires only that the probative value be something more than nothing.

25. **Evidence: Words and Phrases.** Although relevant, evidence may be excluded if its probative value is substantially outweighed by the

danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. Unfair prejudice means an undue tendency to suggest a decision based on an improper basis.

26. **DNA Testing: Evidence.** Inconclusive DNA results are irrelevant because they do not help the fact finder assess whether the defendant is or is not the source of the sample.

27. **Rules of Evidence.** "Opening the door" is a rule of expanded relevancy which authorizes admitting evidence that would otherwise be irrelevant in order to respond to (1) admissible evidence which generates an issue or (2) inadmissible evidence admitted by the court over objection.

Appeal from the District Court for Hall County: Mark J. Young, Judge. Affirmed.

Robert W. Kortus, of Nebraska Commission on Public Advocacy, for appellant.

Douglas J. Peterson, Attorney General, and Stacy M. Foust for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Papik, and Freudenberg, JJ.

Miller-Lerman, J.

## NATURE OF CASE

Ahmed Said appeals his convictions and sentences in the district court for Hall County for second degree murder and use of a weapon to commit a felony. Said claims on appeal that the court erred when it (1) admitted statements he made as a result of allegedly unconstitutional interrogations, (2) admitted evidence from an allegedly unconstitutional search of his cell phone, (3) prohibited him from presenting evidence regarding the victim's mental health and use of alcohol and prescription drugs, (4) denied him the right to impeach a witness' testimony with cross-examination regarding specific instances of conduct and bias, and (5) allowed evidence regarding DNA testing, which Said argued was inconclusive and therefore

irrelevant and unfairly prejudicial. We affirm Said's convictions and sentences.

## STATEMENT OF FACTS

*Investigation of Death and*
*Charges Against Said.*

The State charged Said with second degree murder and use of a weapon to commit a felony in connection with the death of Adulma Khamis. Around 7 a.m. on April 13, 2017, a police officer who was responding to a call for a welfare check found Khamis lying unconscious on the ground outside a residence located approximately five blocks away from Pioneer Park in Grand Island, Nebraska. Khamis was taken to a hospital, where it was determined that he was comatose and had multiple fractures to his skull and a large amount of bleeding between his skull and brain. Surgery was performed, but Khamis died several days later, on April 19. The pathologist who performed the autopsy on Khamis determined that the cause of death was "blunt trauma to the head resulting in skull fractures and significant trauma to the left side of the brain."

After learning from the emergency room doctor that Khamis had suffered serious head trauma and a fractured skull, the responding officer and other police began to investigate the matter as a criminal one. The responding officer secured the location where he had found Khamis. He also attempted to speak with Khalil Kouri, a man the officer knew from previous contacts to live in the residence outside of which Khamis had been found. Kouri was not there at the time, but police later contacted him at work.

Kouri testified at trial in this case that Khamis was a friend of his and that Khamis would sometimes visit Kouri's home. Kouri testified that on the evening of April 12, 2017, a few friends, not including Khamis, were socializing at Kouri's residence. Kouri recalled that at some point in the evening, he heard an unknown person knocking on his door, but that

he told the person to go away because he had to work in the morning and wanted to go to sleep. Kouri testified that when he went to work at 5 a.m. the next day, it was still dark and he did not notice anything unusual.

As the investigation continued, Said became a suspect based on evidence including security camera videos that, the parties stipulated at trial, depicted a fight between Said and Khamis on the evening of April 12, 2017. The security cameras were from a business located near Pioneer Park.

The State's theory of the case at trial was that Said had caused the fatal injuries to Khamis by striking him in the head with a metal pole and that Khamis had remained conscious and mobile for some time after the injury, eventually becoming unconscious after attempting to be admitted to Kouri's residence. Said asserted as part of his defense that Khamis had been the aggressor in the fight and that Said's actions in the fight had been taken in self-defense. Said further attempted to develop Kouri as an alternate suspect in causing Khamis' death. Evidence at Said's trial included numerous exhibits and testimony by numerous witnesses; the discussion of evidence and proceedings hereinafter focuses on matters related to issues raised in this appeal.

*Motion to Suppress Said's Statements*
*in Interrogations and Letter.*

Prior to trial, Said filed a motion to suppress statements he made as a result of what he asserted were unconstitutional custodial interrogations. Said specified four separate interrogations in his motion, but on appeal, he focuses on two dates—April 20 and June 5, 2017. Said also sought to suppress a letter dated April 29, 2017, that he had written to his sister while he was in prison; he asserted that the letter was improperly seized as "fruit of the poisonous tree" stemming from prior interrogations. After an evidentiary hearing, the district court granted in part and overruled in part Said's motion to suppress the statements and the letter.

Regarding the April 20, 2017, interrogation, evidence at the hearing indicated that Said had been arrested on April 19 on a charge unrelated to the present case. Officers, including Steven Sloan, interviewed Said on April 19. Sloan returned on April 20 and asked Said to discuss a different case—the assault of Khamis. A recording of the interview indicated that at the beginning of the interview, Said appeared willing to talk to Sloan. But after Sloan read Said his *Miranda* rights and asked whether he was willing to speak without an attorney, Said replied, "Uh, no." After Sloan asked again whether Said "want[ed] to talk to [him]," Said replied, "[N]o, I do not." Sloan did not then stop the interview. Instead, Sloan continued attempting to convince Said to talk and, inter alia, explained that he wanted to talk about "something . . . different" from what they had talked about on April 19. Said then agreed to speak with Sloan, and they discussed the present case. At approximately 21 minutes into the interview, Said stated, "[N]o more talking" and "I'm just going to stop talking and just cut off because I'm trying to go back . . . ." Sloan continued the interview and confronted Said with evidence connected to the investigation regarding Khamis.

In its order on the motion to suppress, the district court found that statements Said made in the April 19, 2017, interview were voluntary and that officers honored Said's request when he indicated that he wished to stop talking. The court determined that because the April 20 interview involved a different case, Said's assertion of his rights at the end of the April 19 interview did not bar the April 20 interview. The court determined that although at the beginning of the April 20 interview, Said stated he did not want to speak without an attorney, Sloan "attempted to clarify" and Said subsequently spoke voluntarily until the 21-minute mark, when he said, "[N]o more talking." The court concluded that Said's statements prior to the 21-minute mark were voluntary but that statements after that point should be suppressed.

Sloan returned to speak with Said on June 5, 2017. Sloan read Said his *Miranda* rights, and Said waived them. The district court determined that Said's statements and his waiver of rights on June 5 were voluntary. The court determined that "[g]iven the over two-week break between the April 20, 2017, interview and the June 5, 2017, contact there was a sufficient break" from any coercion related to the April 20 interview. The court overruled the motion to suppress as to the June 5 statements.

The letter Said sought to suppress was written by him to his sister and was dated April 29, 2017. In the letter, Said asked his sister to get him a lawyer. He also asked her to inquire about the security camera at the business near the Pioneer Park to determine what angles and areas the camera recorded. He further named a witness who "told them [e]verything," and he asked his sister to "[p]ress [the witness'] [a]ss."

Said contended that the letter was "fruit of the poisonous tree" because he wrote the letter based on information he had learned from the investigators in the allegedly improper interviews of April 19 and 20, 2017. The district court rejected Said's argument. The court reasoned that (1) the April 19 interview and most of the April 20 interview did not violate Said's rights, (2) there was evidence that Said could have learned the information from sources other than the investigators, and (3) writing the letter was Said's voluntary decision and was not a result of police misconduct. The court therefore overruled Said's motion to suppress the letter.

At trial, the court admitted the letter and various statements from the two interviews over Said's renewed objections. Among the statements from the April 20, 2017, interview put into evidence were statements in which Said denied having worn an orthopedic boot on April 12, denied knowing a witness, and denied drinking alcohol on April 12. Other evidence at trial contradicted these statements, and the State used Said's statements in the interview to argue that he was lying in order to hide his involvement in Khamis' death. In the June 5

interview, Said made statements to the effect that he was upset that law enforcement had intercepted the letter he wrote to his sister.

*Motion to Suppress Evidence Obtained
From Search of Cell Phone.*

Also prior to trial, Said filed a motion to suppress evidence that had been obtained from a search of his cell phone. The search had been conducted pursuant to a search warrant that had been issued by the court based on Sloan's affidavit. Said argued that (1) the affidavit did not include sufficient information to establish probable cause for the search and (2) the affidavit and the warrant based on it were overbroad and not sufficiently limited in scope to items directly related to any probable cause that might justify the search. Regarding the lack of probable cause, Said argued, inter alia, that Sloan's affidavit omitted information that would have undermined the credibility of Hussein Nuri, who had told investigators, inter alia, that Said had told Nuri that he had struck Khamis with a metal pole. Said asserted Sloan omitted information regarding Nuri's prior conviction for false reporting, Nuri's alcohol problems, and physical evidence that contradicted what Nuri said Said had told him.

In its order overruling the motion to suppress, the district court noted that a second affidavit that resulted in a second search warrant cured the omission. The court nevertheless examined the first affidavit and warrant and determined that the omissions regarding alcohol abuse and contradictory physical evidence were not material because there was no indication Nuri was drunk when he made his statement to Sloan and because the physical evidence contradicted details but did not contradict the main point of Said's reported statement to Nuri—that he had struck Khamis. The court determined Sloan should have disclosed Nuri's record for honesty, but it concluded that even without Nuri's statements, there was sufficient evidence to support probable cause; such evidence

included the security camera recordings depicting the fight between Said and Khamis and Said's letter to his sister. The court reasoned this evidence showed that the cell phone might contain information regarding the fight, such as communications between Said and Khamis that might have led to the fight, as well as location information corroborating Said's presence at the place and time of the fight; the court found that the letter furnished probable cause to believe Said might have used his cell phone prior to his incarceration in order to get information regarding the investigation related to Khamis' assault and death. The court also rejected Said's arguments regarding particularity. As noted above, the court overruled the motion to suppress evidence obtained from the search of the cell phone.

At trial, the court admitted evidence obtained from the search of Said's cell phone over Said's renewed objections. Such evidence included the internet history, which included "Google searches" performed in the days after the fight between Said and Khamis. Terms searched included Said's name, Khamis' name, the name of the hospital to which Khamis was admitted, and local obituaries. The history also included searches regarding head injuries, comas, what happens after a person gets hit in the head with a metal pole, and whether a head injury can cause brain death.

*Evidence Regarding Khamis'*
*Mental State.*

At various points during the trial, Said sought to question witnesses or present evidence regarding Khamis' mental health and prescription drugs in his possession that were used as antipsychotics or to treat depression. Said generally sought to admit the evidence to support his defense that Khamis was the aggressor and that Said acted in self-defense. The court generally sustained the State's objections based on relevance.

During the testimony of the nurse who treated Khamis at the hospital, Said attempted to cross-examine her regarding

information she may have gathered regarding a history of "chronic alcoholism," Khamis' "psychological history," and his "prior history involving hospitalizations." The court sustained the State's objections based on relevance.

During the cross-examination of a neurological surgeon who treated Khamis, Said asked whether he was aware of "some history of [Khamis] in respect to a psychiatric history." The court sustained the State's objection.

The State thereafter asked the court, outside the jury's presence, for an order preventing Said from asking questions about Khamis' "history of . . . alcohol abuse . . . and any kind of psychiatric matters." In opposition, Said argued that there was evidence that when Khamis was found, he had in his possession an antidepressant (Prozac) and an antipsychotic (Olanzapine). He further noted that Khamis' autopsy showed the presence of an antidepressant, as well as an anticonvulsant drug (Keppra). Said argued that evidence regarding Khamis' possible use of these drugs was relevant to his claim that Khamis was the initial aggressor in the fight, as well as to issues regarding the cause of Khamis' death.

After further argument and offers of proof, the court ruled that Said could ask the doctor "what effects those specific drugs may cause, if those are somehow relevant," but the court stated that it would "not allow questions concerning what the drugs are prescribed for and what they treat." The court further ruled that it would not allow questions regarding Khamis' "chronic alcohol use or alcoholism" without Said's showing a "nexus between prior alcohol use and his condition" at relevant times. The court later clarified that by the "effects" of a drug, it meant "the impacts [the drug] would have had on the treatment at [the hospital] on these dates, not its overall why it's prescribed or what it treats."

Said's cross-examination of the neurological surgeon continued thereafter. Said was allowed to ask questions regarding the effects of the drugs Prozac, Olanzapine, and Keppra.

Prior to Said's cross-examination of the pathologist who performed the autopsy on Khamis, the court ruled on a pending evidentiary issue. The court stated as follows:

Khamis's prior suicide attempt, mental health diagnoses or mental health applications (sic) are not relevant, and even if relevant, applying the [rule] 403 balancing test, the Court finds prejudice as defined in [rule] 403 substantially outweighs the probative value and inquiry is not allowed.

. . . .

As to the medications discussed in the toxicology report, as to each medication, . . . Said's counsel may inquire on cross-examination of whether the medication led to death, led to his death, or changed the doctor's opinion as to the cause of death. Counsel may also inquire if he observed injuries consistent with seizures [or] a fall related to seizures.

. . . .

Counsel may not inquire as to what mental health treatments or drugs found in . . . Khamis's system are prescribed for . . . .

Counsel may, subject to other objections, inquire as to whether the witness knows if Keppra . . . leads to aggressive behavior. . . .

. . . .

[Regarding Prozac,] I find there's an insufficient nexus . . . regarding aggression, while it has a number of other reported side effects, there's simply not enough nexus on the record before the Court . . . .

. . . .

. . . I make the same findings as to [Olanzapine] and will not allow cross-examination on that.

*Impeachment of Nuri.*

At trial, Nuri testified, inter alia, that Said told him that Said "struck [Khamis] with a metal stick in the back of his

head twice in the alley." On cross-examination, Said asked Nuri if he had ever been convicted of "a crime of dishonesty"; Nuri replied that he had. Said began another line of questioning, to which the State objected. Outside the jury's presence, the parties argued to the court regarding Said's anticipated lines of questioning.

One issue was that in Nuri's deposition, he had admitted that on his Facebook page he had lied by saying that he had graduated from a certain university and that he had worked for a certain bank. Said argued that this evidence was admissible pursuant to Neb. Evid. R. 608, Neb. Rev. Stat. § 27-608(2) (Reissue 2016). After the parties argued the issue, the court ruled that it would not allow Said to cross-examine Nuri "concerning false claims made by . . . Nuri on his Facebook page."

Another issue arose at trial regarding Nuri's pending criminal charges. Specifically, Nuri had entered a plea to a pending criminal charge and was awaiting sentencing. Said argued that evidence of the pending charge was relevant to show bias and a motive to fabricate testimony. The court ruled that it would be improper to cross-examine Nuri regarding the pending charge, because "there's been no showing that [Nuri] has any specific inducement such as a promise of leniency" and "Nuri has pled to whatever the underlying facts are."

*DNA Evidence and "Uninterpretable" Samples.*

In his defense, Said called witnesses, including Brandy Porter, a forensic scientist in the Nebraska State Patrol Crime Laboratory. Porter testified that she had performed DNA analysis on multiple samples that were collected in connection with this case, including samples from several stains on the clothing Khamis was wearing. She compared the samples to reference samples from Khamis, Said, and Kouri.

Said questioned Porter regarding her testing of certain specific stains. With regard to those specific stains, Porter testified that her analysis indicated that Khamis was

included as a potential major contributor and that Said was excluded. Testing of certain stains indicated a second contributor, and Porter testified that Said was excluded as the second contributor.

On cross-examination, the State questioned Porter regarding general matters pertaining to DNA analysis. As part of that questioning, Porter testified that an "interpretable profile is a DNA profile in which I can make conclusions regarding the identity of the individuals in that sample" and that "[i]f we can't make scientific conclusions regarding the identity of the individuals, the profile is deemed uninterpretable." She further testified, "Uninterpretable means that the sample is either too complex or it doesn't have enough genetic information present for me to make an accurate scientific conclusion regarding who is present in that sample."

The State then asked whether "[i]n this particular case, [Porter had made] a determination that any of the items that [she] tested were uninterpretable." The court allowed Porter to answer over Said's objection, and Porter replied in the affirmative. Thereafter, the State asked Porter about her testing of various specific samples other than those about which Said had questioned her on direct. Porter testified over Said's continuing objections that as to some of those specific samples, results regarding contributors other than Khamis were determined to be uninterpretable, and that as to other specific samples, Khamis was included and both Said and Kouri were excluded as contributors.

At the end of the State's cross-examination of Porter, the court gave the following limiting instruction:

Evidence of uninterpretable DNA results is offered only to show you what steps were taken to test the items by the analyst. DNA testing results that are uninterpretable are not to be considered by you as evidence that anyone contributed to that DNA sample — to the sample. The jury may not speculate as to who may or may not have

contributed to any sample that was listed or tested, the
result of which was considered to be uninterpretable.
On redirect, Said elicited from Porter testimony that she was
able to make scientific conclusions on 19 samples from which
Said was excluded and that Said was not included in any
samples for which she was able to make scientific conclusions.

*Verdict, Sentence, and Appeal.*

Said rested his defense after Porter's testimony, and the
State chose not to present rebuttal evidence. Thereafter, the
court read its instructions and submitted the case to the jury.
The jury found Said guilty of second degree murder and use
of a weapon to commit a felony. The district court sentenced
Said to imprisonment for 60 to 80 years for second degree
murder and for a consecutive term of 25 to 30 years for use of
a weapon.

Said appeals his convictions and sentences.

## ASSIGNMENTS OF ERROR

Said claims that the court erred when it (1) admitted state-
ments he made in the April 20 and June 5, 2017, interrogations
and in the letter to his sister; (2) admitted evidence from the
search of his cell phone; (3) prohibited him from presenting
evidence regarding Khamis' mental state and his use of drugs
and alcohol; (4) denied him the right of confrontation and the
opportunity to impeach Nuri's testimony with evidence of spe-
cific instances of conduct and bias; and (5) allowed testimony
by Porter regarding DNA testing that Said asserts was incon-
clusive and therefore irrelevant and unfairly prejudicial.

## STANDARDS OF REVIEW

[1] In reviewing a motion to suppress a statement based on
its claimed involuntariness, including claims that law enforce-
ment procured it by violating the safeguards established by
the U.S. Supreme Court in *Miranda v. Arizona*, 384 U.S. 436,
86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), an appellate court

applies a two-part standard of review. Regarding historical facts, an appellate court reviews the trial court's findings for clear error. Whether those facts meet constitutional standards, however, is a question of law, which an appellate court reviews independently of the trial court's determination. *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020).

[2] In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protection is a question of law that an appellate court reviews independently of the trial court's determination. *Id*.

[3,4] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *Id*.

[5-7] A trial court exercises its discretion in determining whether evidence is relevant and whether its prejudicial effect substantially outweighs its probative value. *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id*. A trial court's determination of the relevancy and admissibility of evidence must be upheld in the absence of an abuse of discretion. *State v. Carpenter*, 293 Neb. 860, 880 N.W.2d 630 (2016).

The determination of whether procedures afforded an individual comport with constitutional requirements for procedural due process presents a question of law. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017).

## ANALYSIS

*Any Error in the Admission of Statements From*
*Two Interviews Was Harmless Error, and*
*District Court Did Not Err When It*
*Overruled Said's Motion to*
*Suppress the Letter.*

Said claims that the court erred when it admitted statements he made in the April 20 and June 5, 2017, interviews and in the letter to his sister. He argues that at the beginning of the April 20 interview, he invoked with clear and unequivocal language his right to remain silent, and that all statements he made thereafter, including statements made in that interview as well as statements made in the letter and in the June 5 interview, were inadmissible as having been obtained in violation of his *Miranda* rights. We determine that admission of Said's statements in the April 20 and June 5 interviews was harmless error and that overruling the motion to suppress the letter was not error.

We first consider the April 20, 2017, interview. The district court determined that Said clearly invoked his *Miranda* rights 21 minutes into the interview, and it therefore suppressed statements he made after that point. But the court determined his statements prior to that point were voluntary and therefore admissible. Said argues that the entire interview should have been suppressed because he clearly and unequivocally invoked his rights at the beginning of the interview.

[8-10] The safeguards of *Miranda* ensure that the individual's right to choose between speech and silence remains unfettered throughout the interrogation process. *State v. Clifton*, 296 Neb. 135, 892 N.W.2d 112 (2017). If the suspect indicates that he or she wishes to remain silent or that he or she wants

an attorney, the interrogation must cease. *Id*. The right to choose between speech and silence derives from the privilege against self-incrimination. *Id*. In order to require cessation of custodial interrogation, the subject's invocation of the right to counsel must be unambiguous and unequivocal. *State v. Guzman*, 305 Neb. 376, 940 N.W.2d 552 (2020). Once a person has invoked his or her right to remain silent, the police must scrupulously honor that right. *State v. Bauldwin*, 283 Neb. 678, 811 N.W.2d 267 (2012).

In its brief, the State argues that persons who are already incarcerated when they are interviewed are not subject to the same pressures against which the *Miranda* protections are designed to operate and that therefore, such interviews are not considered custodial interrogations. The State cites two U.S. Supreme Court cases, *Howes v. Fields*, 565 U.S. 499, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012), and *Maryland v. Shatzer*, 559 U.S. 98, 130 S. Ct. 1213, 175 L. Ed. 2d 1045 (2010). The State acknowledges that unlike the present case, the cases cited involved persons who had already been convicted and sentenced and were serving a set term in prison. The State urges that the reasoning in the two U.S. Supreme Court cases be extended to cases involving pretrial detainees, like Said at the time of the statements at issue. Said contends that extending these cases to a pretrial defendant detained for a short period is not proper.

We need not resolve this dispute, because, despite raising this argument, the State concedes that on the facts of this case—including the fact that at the time of the April 20, 2017, interview, Said had been in detention for fewer than 24 hours—"viewed objectively, the coercive atmosphere and pressure from April 19th most likely still existed on April 20th and Said was in custody for purposes of *Miranda* on that date." Brief for appellee at 26. The State further notes that the officer twice asked Said whether he was willing to talk without a lawyer and that both times, Said replied that he was not. Although it argues that asking the second time was a proper

clarification of Said's response to the first question, the State concedes that when the officer continued urging Said to talk, it was an interrogation that should not have been undertaken after Said clearly invoked his *Miranda* rights. The State concludes in its brief that "the district court erred when it admitted Said's statements from the April 20th interview." Brief for appellee at 28.

[11-13] Having conceded that the court erred when it admitted Said's statements from the April 20, 2017, interview, we turn to the State's further argument that the erroneous admission of statements from the April 20 interview was harmless error. We have said that even constitutional error does not automatically require reversal of a conviction if that error was a trial error and not a structural defect. *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014). The admission of an improperly obtained statement is a trial error, and so its erroneous admission is subject to harmless error analysis. *Id*. To conduct harmless error review, we look to the entire record and view the erroneously admitted evidence relative to the rest of the untainted, relevant evidence of guilt. *Id*. Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but whether the actual guilty verdict rendered in the questioned trial was surely unattributable to the error. *State v. Nolan*, 292 Neb. 118, 870 N.W.2d 806 (2015).

The State notes that in the April 20, 2017, interview, Said did not confess to the crime under investigation and that therefore, the statements in and of themselves did not incriminate him. Said argues that admission of the statements was not harmless error, because although he did not admit to any wrongdoing, he made several statements that were contradicted by other evidence presented by the State. He argues that admission of the statements harmed him because the State used the statements to call his credibility into issue even

though he was not a witness in the trial. In addition and in a similar vein, Said objected to portions of the prosecution's closing arguments as having put Said's credibility into issue when he was not a witness and had not otherwise put his character at issue in the case. In lieu of declaring a mistrial, the court at Said's request provided a curative instruction that the jury was to "determine only the credibility of the witnesses who testify" and that it was "to disregard any statements, written or spoken, concerning the credibility of persons who did not testify."

In response to Said's arguments, the State contends that there was evidence aside from Said's statements to police which indicated that Said had attempted to diminish his involvement in the altercation with Khamis. The State further contends that the prosecutor's references in closing arguments to Said's statements on April 20, 2017, were brief. The State thus asserts that error regarding the April 20 statements was harmless.

We agree that the error in admitting statements from the April 20, 2017, interview was harmless error. Viewing the statements in the context of "the entire record" and "the rest of the untainted, relevant evidence of guilt," see *State v. DeJong*, 287 Neb. at 884, 845 N.W.2d at 874-75, we determine the guilty verdict in this case was "surely unattributable" to the error in admitting the statements, see *State v. Nolan*, 292 Neb. at 140, 870 N.W.2d at 825. There was other evidence that Said attempted to diminish his involvement in this case, and to the extent the statements might have been seen as evidence of his credibility, the court made clear to the jury in the curative instruction that Said's credibility was not at issue.

We next consider the April 29, 2017, letter that Said wrote to his sister. Said argues that the "fruit of the poisonous tree" doctrine applies because the letter and its contents were the result of the April 20 interview and that because that interview was in violation of his rights, the letter should also be inadmissible.

[14] The fruit of the poisonous tree doctrine generally provides that evidence must be excluded as fruit of the poisonous tree if it is discovered by the exploitation of illegal police conduct. See *State v. Gorup*, 275 Neb. 280, 745 N.W.2d 912 (2008). The State argues that the fruit of the poisonous tree doctrine is generally applied only in the context of a search or seizure in violation of the Fourth Amendment and that to the extent that Said contends the content of the letter is at issue, it is questionable whether the doctrine even applies in the context of such a Fifth Amendment violation. However, assuming it does apply in such context, the State argues that the doctrine would not require exclusion of the letter, because the letter was not discovered through governmental exploitation of the April 20, 2017, interview.

[15] For purposes of our analysis in this case, we assume the doctrine applies. Not all evidence is fruit of the poisonous tree simply because it would not have come to light but for the illegal action of the police. *State v. Bray*, 297 Neb. 916, 902 N.W.2d 98 (2017). The question is whether the evidence has been obtained by exploiting the primary illegality or has instead been obtained by means sufficiently distinguishable so as to be purged of the primary taint. *Id*.

Said argues that the letter was the fruit of the poisonous tree of the April 20, 2017, interview because he was prompted to write the letter based on what he learned about the police investigation in the interview. But the police did not use information they obtained in the April 20 interview to discover the letter, and therefore, the police did not exploit any information they had learned from the interview in order to discover the letter. Said's action of writing the letter in response to the interview broke any causal connection between the State's actions in the interview and the State's later discovery of the letter, and such discovery was sufficiently attenuated from the April 20 interview. See *State v. Bray, supra*. We conclude that the discovery of the letter was not a result of police exploitation of the April 20 interview. The letter was not inadmissible

under the fruit of the poisonous tree doctrine, and therefore, the court did not err when it overruled Said's motion to suppress the letter.

We finally consider the June 5, 2017, interview. Said argues that statements he made in the June 5 interview should have been suppressed because that interview was a continuation of the questioning in the April 20 interview in which he had invoked his right to remain silent. He cites *State v. Pettit*, 227 Neb. 218, 417 N.W.2d 3 (1987), and argues that there was not a significant passage of time after the April 20 interview and that the subject of the June 5 interview was the same transaction or occurrence that was the subject of the April 20 interview.

The State concedes in its brief that the *Pettit* factors were not met, but it argues that any error in admitting statements from the June 5, 2017, interview was harmless error. We agree. Said argues that admission of the June 5 statements was not harmless, because he made statements to the effect that he was upset that law enforcement had intercepted the letter he wrote to his sister. He asserts the State used the letter and Said's sensitivity to the interception of the letter as an integral part of its closing argument. But we agree with the State's argument that Said's statements that he was upset the police found the letter was "inconsequential" in light of the fact that the letter itself was admissible. Brief for appellee at 33. Viewed in the context of the entire record and properly admitted evidence, we determine the verdict was surely unattributable to any error in admitting statements from the June 5 interview.

*District Court Did Not Err When It Overruled
Motion to Suppress Evidence From
Search of Said's Cell Phone.*

Said next claims that the court erred when it admitted evidence from the search of his cell phone. He contends that the warrant authorizing the search and the application supporting

the warrant lacked both probable cause and particularity. We conclude that the district court did not err when it overruled the motion to suppress evidence obtained from the search.

The Fourth Amendment to the U.S. Constitution provides that warrants may not be granted "but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Nebraska Constitution, under article I, § 7, similarly provides that "no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

[16-18] We first consider Said's argument that probable cause to support the search warrant was lacking. In reviewing the strength of an affidavit submitted as a basis for finding probable cause to issue a search warrant, an appellate court applies a totality of the circumstances test. *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019). The question is whether, under the totality of the circumstances illustrated by the affidavit, the issuing magistrate had a substantial basis for finding that the affidavit established probable cause. *Id*. Probable cause sufficient to justify issuance of a search warrant means a fair probability that contraband or evidence of a crime will be found. *Id*. In evaluating the sufficiency of an affidavit used to obtain a search warrant, an appellate court is restricted to consideration of the information and circumstances contained within the four corners of the affidavit, and evidence which emerges after the warrant is issued has no bearing on whether the warrant was validly issued. *Id*.

Said contends that the affidavit submitted by Sloan did not assert adequate facts to show that evidence related to the investigation would be found on Said's cell phone. He maintains instead that the affidavit contained only generalized assertions to the effect that "'persons who commit crimes use cell phones.'" He similarly maintains that the district court's reasoning for finding probable cause was that generally, cell

phone data can often lead to evidence, and asserts that such reasoning was erroneous.

Contrary to Said's characterization of the affidavit, the record shows that in addition to statements setting forth the officer's general knowledge of how cell phones may be used by a person who is committing or has committed a crime and how evidence of the crime may be found on a cell phone, the affidavit also sets forth specific information regarding the officer's investigation of this case and Said's involvement in the altercation with Khamis. This information included allegations that Said had communicated with others, including his sister and Nuri, and that he sought information regarding the assault of Khamis and the police investigation of the assault. These actions could establish that Said was interested in learning about the police investigation of the assault, and the court could infer that if Said was looking for such information from other people, he likely also used his cell phone to search the internet for such information. In the affidavit, the officer listed the specific types of evidence he was seeking to find on the cell phone. The listing of items included various references that made clear the officer was seeking information regarding the relationship of Said and Khamis and communications regarding an altercation between the two on April 12, 2017.

We conclude the warrant was supported by probable cause. The affidavit, including allegations of evidence such as the video depicting the altercation between Said and Khamis, gave the officer reason to suspect Said in the investigation of the assault of Khamis. The affidavit also made clear that the officer was seeking evidence related to that investigation and that relevant evidence could be found on Said's cell phone. The court therefore did not err when it determined the affidavit established probable cause that evidence relevant to the investigation of the assault of Khamis could be found on Said's cell phone.

[19] We next consider Said's argument that the warrant lacked particularity. In addition to the requirement of probable cause, the Fourth Amendment and article I, § 7, contain a particularity requirement that a warrant describe the place to be searched and the persons or things to be seized. The particularity requirement for search warrants is distinct from, but closely related to, the requirement that a warrant be supported by probable cause. *State v. Goynes*, 303 Neb. 129, 927 N.W.2d 346 (2019). A purpose of the particularity requirement for a search warrant is to prevent the issuance of warrants on loose, vague, or doubtful bases of fact. *Id*.

[20] To satisfy the particularity requirement of the Fourth Amendment, a warrant must be sufficiently definite to enable the searching officer to identify the property authorized to be seized. *Id*. The degree of specificity required depends on the circumstances of the case and on the type of items involved. *Id*. A search warrant may be sufficiently particular even though it describes the items to be seized in broad or generic terms if the description is as particular as the supporting evidence will allow, but the broader the scope of a warrant, the stronger the evidentiary showing must be to establish probable cause. *Id*. As relevant to the instant case, a warrant for the search of the contents of a cell phone must be sufficiently limited in scope to allow a search of only that content that is related to the probable cause that justifies the search. *Id*.

[21] The purpose of the particularity requirement as it relates to warrants is to prevent general searches, and whether a warrant is insufficiently particular depends upon the facts and circumstances of each case. *State v. Stelly*, 304 Neb. 33, 932 N.W.2d 857 (2019). As a general rule, the description must enable officers to ascertain and identify the items to be seized with reasonable certainty and little chance of confusion or uncertainty. *Id*.

With regard to particularity, Said's argument focuses specifically on paragraph (i) of Sloan's affidavit, which requests a search of internet history "relat[ed] to the purchase or

manufacturing of re-encoded devices and/or the sale of the proceeds of the transactions." He notes that the request was not to search for internet history evidencing the crime being investigated and as a result merely served to request a general license to search the internet history. Said also argues that the request and the warrant issued thereon are overbroad because they allowed a search of internet history without limiting the search to evidence related to the homicide investigation. Said argues this was similar to the "'any information'" warrant that we found to be insufficiently particular in *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014). See brief for appellant at 37.

[22] We conclude the warrant was sufficiently particular. The record shows that the reference to a different crime in paragraph (i) of the affidavit was clearly an inadvertent error that was carried over to this warrant from a form in a prior matter. An inadvertent defect in a search warrant may be cured by reference to the affidavit used to obtain the warrant if the affidavit is incorporated in the warrant or referred to in the warrant and the affidavit accompanies the warrant. *State v. Stelly, supra*. In this case, the affidavit was referred to in the warrant, and although it also contained the erroneous reference to a different crime, the inadvertent defect was only one item in a list of the types of evidence to be searched. The error is apparent in context because other items in the list, as well as the warrant and the affidavit read as a whole, make clear that the evidence being sought in the search of the cell phone was evidence related to the investigation of the assault of Khamis and not the crime that was erroneously referenced.

We also find that the warrant was not overbroad. Although the warrant listed various types of data that could be searched for on the cell phone, it listed specific types of evidence, and unlike the warrant in *Henderson*, it did not authorize a search for "'any information.'" See brief for appellant at 37. We distinguished *Henderson* in *State v. Goynes*, 303 Neb. 129, 144, 927 N.W.2d 346, 357 (2019), in which we found a

warrant to be sufficiently particular because it identified that it was a warrant for the investigation of a specific homicide and because although it included an expansive list of types of data that could be searched, it "did not contain such unqualified language that would permit the search of the cell phone for '"any other information."'" In the list of types of data that could be searched in this case, various items specified data "relating to the relationship of Khamis and [Said] and communication pertaining to the physical altercation occurring on [April 12, 2017]." Although this specification was not included as to each item, the warrant read as a whole was clear that the search was limited to data that would provide evidence relevant to the investigation of Said in connection with the assault of Khamis.

Furthermore, as the State notes, there was no danger that the officer executing the search warrant would not know the target of the search was evidence related to the homicide investigation regarding Khamis, because the same officer prepared the affidavit and conducted the search. We also note that the evidence found and used in the trial was relevant to this crime and that there is no indication any of the evidence found and used in this trial was not relevant to the probable cause that supported the warrant.

We determine that the warrant in this case was supported by probable cause and was sufficiently particular. We therefore conclude the district court did not err when it overruled Said's motion to suppress evidence found in the search of the cell phone.

*District Court Did Not Abuse Its Discretion or Deprive*
*Said of Complete Defense When It Refused Evidence*
*Regarding Khamis' Mental Health, Alcoholism,*
*and Use of Prescription Drugs.*

Said next claims the court erred when it prohibited him from presenting evidence regarding Khamis' mental health issues, his alcoholism, and his use of prescription drugs. He

asserts that such evidence was critical to his defense because it was relevant to his defense that Khamis was the aggressor and that Said therefore acted in self-defense; he also argues the evidence was relevant to his alternate defense that Khamis' death was caused by something other than a blow to the head inflicted by Said. He further argues that he was deprived of a fair trial when he was prohibited from presenting such evidence. We determine that the court did not abuse its discretion when it excluded the evidence based on its determinations regarding relevance and that such rulings did not deprive Said of his right to present a complete defense.

Said's arguments focus on evidence regarding (1) Khamis' history of alcoholism; (2) Khamis' mental health history, which included suicidal tendencies; and (3) the purposes, side effects, and adverse reactions associated with prescription drugs that were found on Khamis' person or found in his system at the autopsy. Said argues that such evidence was relevant to his defenses that (1) Khamis was the first aggressor and Said acted in self-defense and that (2) Khamis died from a cause unrelated to the altercation between Said and Khamis.

[23] In view of Said's assignments of error, we consider the propriety of the evidentiary rulings and whether the rulings deprived Said of the right to present a complete defense. We have stated that whether rooted directly in the Due Process Clause of the 14th Amendment or in the Compulsory Process or Confrontation Clauses of the 6th Amendment, the federal Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense. *State v. McCurry*, 296 Neb. 40, 891 N.W.2d 663 (2017). However, the accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence. *Id*.

[24,25] Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Neb. Evid. R. 401,

Neb. Rev. Stat. § 27-401 (Reissue 2016). Relevancy requires only that the probative value be something more than nothing. *State v. Munoz*, 303 Neb. 69, 927 N.W.2d 25 (2019). But, "[e]vidence which is not relevant is not admissible." Neb. Evid. R. 402, Neb. Rev. Stat. § 27-402 (Reissue 2016). And, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). Unfair prejudice means an undue tendency to suggest a decision based on an improper basis. *State v. Stubbendieck*, 302 Neb. 702, 924 N.W.2d 711 (2019).

We first address the court's rulings in light of Said's argument that each type of evidence noted above was relevant to his defense of self-defense. Regarding evidence of Khamis' alcoholism, the court ruled that the evidence was not relevant and not admissible without a showing of a nexus between his alcoholism and aggressive behavior at the time of his altercation with Said. The court similarly found that Khamis' "prior suicide attempt" and other mental health issues were not relevant. The court also stated that to the extent evidence regarding Khamis' mental health history might have minimal probative value regarding his behavior at the time of the altercation, such probative value was substantially outweighed by the risk of unfair prejudice.

Regarding the prescription drugs found on Khamis' person—Prozac and Olanzapine—the court found that there was not a sufficient showing that either drug caused aggression. The State further notes that Olanzapine was not found to be in Khamis' system and that therefore, there was no showing Khamis was under its effect at the time of the altercation. The drugs found in Khamis' system in the toxicology screening were an "anticonvulsant and . . . an antidepressant." The antidepressant was presumably Prozac, and the court found

that although there was evidence that "hostility" and "agitation" were shown to be side effects of Prozac, Said had not established a nexus between Prozac and aggressive behavior. The court's ruling allowed Said to ask questions regarding the effects of the anticonvulsant drug, Keppra, and Said did elicit testimony that effects of Keppra include "aggression, agitation, depression, and irritability."

We determine that it was within the court's discretion to rule that without a showing of a nexus between the offered evidence and Khamis' behavior at the time of the altercation, the evidence was not relevant to whether Khamis might have been the aggressor and whether Said acted in self-defense. Regarding whether exclusion of the evidence deprived Said of a fair trial, as noted above, the right to present a complete defense does not allow a defendant "an unfettered right to offer testimony that is . . . otherwise inadmissible under standard rules of evidence." *State v. McCurry*, 296 Neb. 40, 66, 891 N.W.2d 663, 681 (2017). In further support of our understanding that Said was not harmed by the district court's ruling, we also note that Said was able to present relevant evidence in regard to self-defense, including asking a witness about Khamis' alcohol use at or around the time of the altercation, and he was able to present evidence that aggression is a side effect of Keppra, which was found in Khamis' system. Using this evidence, Said was able to argue in closing arguments that the combination of alcohol and Keppra could have caused Khamis to be aggressive in the altercation. And the jury was instructed on Said's theory of self-defense.

We next address the relevance of the evidence to Said's defense theory that Khamis may have died from a cause unrelated to the altercation. Said did not appear to argue that Khamis' history of alcoholism or mental health contributed to his death; instead, Said asserted that Khamis could have sustained injuries in a fall that was caused by the effects of the prescription drugs or the combination of the drugs and alcohol. The State notes that although there was evidence Olanzapine

increased the risk of falls, Olanzapine—as mentioned earlier—was not found in Khamis' system at the autopsy. The State also argues that neither Prozac nor Keppra was shown to cause falls.

The court's ruling focused on limiting evidence regarding the reasons the drugs might be prescribed, which would be indicative of Khamis' mental health issues. But the court ruled that Said could "inquire on cross-examination of whether the medication led to [Khamis'] death, . . . or changed the doctor's opinion as to the cause of death," and whether the doctor "observed injuries consistent with seizures [or] a fall related to seizures." We conclude that the court's limitation of testimony regarding the purpose for which the drugs might have been prescribed was within its discretion to determine relevance and that the court did not abuse its discretion in so ruling. We also conclude that Said was not deprived of the right to present a complete defense as to the defense theory that the cause of death might have been something other than the injury inflicted by Said. The court's rulings allowed Said to ask whether the drugs that were in Khamis' system led to his death or whether the presence of the drugs changed the doctor's conclusion that his death was a result of the blunt force trauma to Khamis' head. We conclude that the court did not abuse its discretion in its rulings regarding the relevance of the offered evidence, and we further conclude that such rulings did not deprive Said of his right to present a complete defense as to either of the asserted defenses.

*District Court Did Not Err and Did Not Deprive
Said of Right of Confrontation When It Refused
Cross-Examination on Issues It Determined
to Lack Probative Value.*

Said next claims the court erred and violated his right of confrontation when it denied him the opportunity to impeach Nuri's testimony with evidence of specific instances of Nuri's conduct and bias. Said argues that he should have been

allowed to impeach Nuri through cross-examination pursuant to § 27-608(2) regarding alleged misrepresentations made by Nuri on his Facebook page and regarding a pending charge against Nuri to which he had pled but in connection with which he had not yet been sentenced. We determine that the court did not abuse its discretion and did not violate Said's right of confrontation when it disallowed cross-examination on these topics.

Said argues that cross-examination on these topics should have been allowed pursuant to § 27-608(2), which provides:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness be inquired into on cross-examination of the witness . . . concerning his character for truthfulness or untruthfulness . . . .

Said argues that Nuri's testimony that Said confessed to Nuri that he had struck Khamis with a metal pole was crucial to his conviction and that therefore, it was critical to Said's defense to impeach Nuri's testimony. He argues that Nuri's "misrepresentations . . . on his Facebook page" and his pending criminal charge were both relevant to his truthfulness and that limiting Said's cross-examination of Nuri violated his right of confrontation. See brief for appellant at 47.

An accused's constitutional right of confrontation is violated when either (1) he or she is absolutely prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness or (2) a reasonable jury would have received a significantly different impression of the witness' credibility had counsel been permitted to pursue his or her proposed line of cross-examination. *State v. Swindle*, 300 Neb. 734, 915 N.W.2d 795 (2018).

In reference to § 27-608(2), we note that Said was not attempting to present extrinsic evidence of "[s]pecific

instances of conduct" and instead was seeking to cross-examine Nuri on these topics. Therefore, the relevant portion of § 27-608(2) is that which allows such cross-examination "in the discretion of the court, if probative of truthfulness or untruthfulness." The statute therefore commits to the court's discretion determinations of whether a line of cross-examination is allowed as being probative of truthfulness or untruthfulness. Regarding Nuri's misrepresentations on Facebook, we find it was reasonable and within the court's discretion to determine that these instances were not probative of the truthfulness or untruthfulness of Nuri's testimony in this case. Regarding Nuri's pending criminal case, the court reasonably determined that the charge was not relevant to bias or a motivation to fabricate testimony, because Nuri had entered a plea, he had done so without benefit of a plea agreement, and Said made no offer of proof to show that Nuri's testimony in this case was an attempt to curry favor with the State in connection with sentencing in that case. We find no abuse of the discretion afforded to the court under § 27-608(2) in either of these rulings.

We also find no violation of Said's right to confrontation. Said was not completely prohibited from cross-examining Nuri regarding his credibility, and such cross-examination included Nuri's admission that he had been convicted of a crime of dishonesty. We do not think that testimony regarding the misrepresentations on Facebook or the pending charge would have given the jury a significantly different impression of Nuri's credibility.

*District Court Did Not Err When It Allowed*
*Evidence That Results of Certain DNA*
*Tests Were Uninterpretable.*

Said finally claims the court erred when on cross-examination it allowed testimony by Porter regarding uninterpretable DNA testing results that Said asserts were "inconclusive" and therefore irrelevant and unfairly prejudicial. Brief for appellant

at 48. We conclude that the court did not abuse its discretion when it allowed the cross-examination.

[26] Said relies on *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015), in which we held that it was error to admit evidence of inconclusive DNA testing results. We reasoned in *Johnson* that inconclusive results "are irrelevant because they do not help the fact finder assess whether the defendant is or is not the source of the sample," and we further reasoned that "because of the significance that jurors will likely attach to DNA evidence, the value of inconclusive testing results is substantially outweighed by the danger that the evidence will mislead the jurors." 290 Neb. at 883-84, 862 N.W.2d at 774.

The State concedes that the "uninterpretable" results in this case are the functional equivalent of "inconclusive" results under *Johnson*. Brief for appellee at 60. But the State distinguishes its introduction of the results in this case from the facts in *Johnson* because it did not offer the evidence in its case in chief. Instead, the State argues, it cross-examined Porter regarding uninterpretable results in order to counter an impression created by Porter's testimony presented by Said. The State argues that the otherwise inadmissible evidence regarding inconclusive DNA testing results became relevant and admissible pursuant to the specific contradiction doctrine.

[27] The specific contradiction doctrine is said to apply when one party has introduced admissible evidence that creates a misleading advantage and the opponent is then allowed to introduce previously suppressed or otherwise inadmissible evidence to counter the misleading advantage. *State v. Carpenter*, 293 Neb. 860, 880 N.W.2d 630 (2016). It is not enough that the opponent's contradictory proffered evidence is merely relevant; the initial evidence must have reasonably misled the fact finder in some way. *Id*. In *Carpenter*, we stated that specific contradiction is one aspect of the "opening the door" doctrine. "Opening the door" is a rule of expanded

relevancy which authorizes admitting evidence that would otherwise be irrelevant in order to respond to (1) admissible evidence which generates an issue or (2) inadmissible evidence admitted by the court over objection. *State v. Lierman*, 305 Neb. 289, 940 N.W.2d 529 (2020).

In this case, Porter testified that she subjected several bloodstains on Khamis' clothing to DNA testing. Testing of some of the stains excluded Said as a contributor, but the testing of several other stains yielded results that Porter described as uninterpretable. Said called Porter as a witness in his defense and questioned her generally about the extent of the testing she had done, and he questioned her specifically about the stains for which testing had excluded Said as a contributor. On cross-examination, the State elicited testimony that several other stains yielded uninterpretable results, and the court allowed the testimony over Said's objections.

The holding in *State v. Johnson*, 290 Neb. 862, 862 N.W.2d 757 (2015), and the specific contradiction and "opening the door" doctrines all derive from a court's evidentiary determinations of relevance and whether probative value is outweighed by unfair prejudice. As such, determinations in this regard are committed to the trial court's discretion and we uphold such determinations in the absence of an abuse of discretion. See *State v. Carpenter, supra*.

We find no abuse of discretion by the district court in its DNA-related rulings. The court could reasonably have determined that by questioning Porter generally about the scope of her testing and then questioning her about the results of only the samples that excluded him, Said may have created a misleading impression that the testing of all samples excluded him. The State elicited Porter's otherwise inadmissible testimony regarding the results that were uninterpretable, and the court reasonably could have determined that such evidence had become relevant to counter the potential misleading impression that all samples excluded Said. To the extent there was a risk of unfair prejudice from testimony

regarding inconclusive results as we recognized in *Johnson*, the court reasonably could have determined that such concern was adequately mitigated by its limiting instruction that the evidence was "offered only to show what steps were taken" and was "not to be considered . . . as evidence that anyone contributed to that DNA sample." We conclude that in this context, the court's admission of the testimony was not an abuse of discretion.

## CONCLUSION

Having rejected each of Said's assignments of error, we affirm Said's convictions and sentences.

Affirmed.

Funke, J., participating on briefs.